IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| William Cox, | : | |
|     Plaintiff, | : | Case No. 1:03-CV-679 |
| v. | : | |
| | : | District Judge Susan J. Dlott |
| Priority America f/k/a Transit Group | : | |
|  Transportation, LLC, | : | ORDER DENYING MOTION FOR |
| | : | PARTIAL SUMMARY JUDGMENT |
|     Defendant. | : | |

This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment (doc. 28). Plaintiff William P. Cox seeks judgment on his claims that Defendant Priority America, f/k/a Transit Group Transportation, LLC ("Priority America") breached his employment agreement and violated Ohio Revised Code § 4113.15 by failing to provide him severance pay upon the termination of his former employment with Priority America. For the reasons that follow, Cox's motion is **DENIED** because genuine issues of material fact remain in dispute.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Cox is a resident of Cincinnati, Ohio, who was formerly employed by the company now known as Priority America. Priority America is a Florida trucking corporation with its principal offices in Orlando, Florida. This case arises out of the termination of Cox's and Priority America's employment relationship.

In the summer of 2002, Priority America hired Tim O'Brien, an executive recruiter, to find a candidate to fill the chief financial officer ("CFO") position for Priority America. Cox submitted a resume to O'Brien and O'Brien recommended Cox for the CFO position to Jim

1

Salmon, Priority America's chief executive officer.

At the time Priority America began its search for a new CFO, the company was going though a bankruptcy reorganization under the control of the Middle District of Florida. Priority America remained the debtor in possession throughout the bankruptcy proceedings. On September 4, 2002, Priority America filed an Amended Joint Plan of Reorganization ("Reorganization Plan") with the consent of its creditor committee and its largest creditor and shareholder, General Electric Capital Corporation ("GECC"). The Reorganization Plan required Priority America to issue warrants to GECC for approximately 75% of its stock when the company emerged from bankruptcy. (Salmon Decl. ¶ 6.) The Reorganization Plan was subsequently amended to address concerns of other creditors. Prior to the Reorganization Plan, GECC owned approximately 34% of the common stock of Priority America. (Id. ¶ 15.) Salmon testified that in September 2002 the long-term plan for the company after its emergence from bankruptcy was that GE would control the company. (Salmon Depo. at 78.) He further testified that he believed that GE would liquidate the company at some point in the future. (Id. at 78-80.)

Also in September 2002, Cox and Salmon began to negotiate the terms of Cox's employment agreement with Priority America. O'Brien drafted the initial agreement, which Salmon revised and sent to Cox for his review on September 19, 2002. Cox rejected this agreement and sent Salmon a two-page counter-proposal also on September 19, 2002. The Cox draft agreement contained a "change of control" provision stating as follows:

> 12. Change of Control: In the event of a [sic] (i) the Company terminates your employment for any reason other than cause or (ii) subsequent to a change of control of the Company you terminate your employment for any reason *within twelve months after the change of control of the Company*, we will continue to pay your base salary, bonus and benefits at the effective date of termination for twelve months from the effective date of termination so long as you do not

> compete with the Company or disclose or use non-public information concerning the Company.

(Salmon Decl. ex. 1. (emphasis added).)  Further, the Cox draft agreement defined "change of control" as a footnote on the second page of the document as follows:

> "Change of Control" a change of control shall be deemed to have occurred *if any party other than GE (and its subsidiaries) becomes the beneficial owner*, directly or indirectly, of securities of the Company representing more than 50% of the combined voting power of the Company's then outstanding securities or a sale of substantially all the assets.  Notwithstanding the foregoing, a change of ownership resulting from an Initial Public Offering of the Companies [sic] securities shall not result in a change of control for purposes of this agreement.

(Id. (emphasis added).)  The parties did not execute the September 19, 2002 Cox draft agreement.

Ultimately, the parties signed an employment agreement in the form of a letter from Salmon to Cox dated September 22, 2002 which was signed by Salmon on September 23, 2002 and signed by Cox on September 24, 2002.  This Letter Agreement contained a "change of control" provision that stated as follows:

> 12. <u>Change of Control:</u> In the event of a [sic] (i) the Company terminates your employment for any reason other than cause or (ii) subsequent to a change of control of the Company you terminate your employment for any reason *within three months after the change of control of the Company*, we will continue to pay your base salary, bonus and benefits at the effective date of termination for twelve months from the effective date of termination so long as you do not compete with the Company or disclose or use non-public information concerning the Company.

(Doc. 28 ex. 1 (emphasis added).)  Thus, the signed Letter Agreement differed from Cox's draft agreement in that Cox had only three months to terminate his employment following a change of control if he wanted to receive the severance benefits.  According to Cox, the Letter Agreement contained only two pages and the "change of control" provision and the signature line were both on the second page.  No definition of "change of control" is stated on the two pages which Cox

contends constitutes the totality of the Letter Agreement.

Salmon, on the other hand, asserts that the Letter Agreement that he signed on September 23, 2002 and sent to Cox for his acceptance contained a total of three pages. He states that the third page of the Letter Agreement contained the identical definition for "change of control" as had been written in Cox's draft agreement. The definition stated in relevant part that "A change of control shall be deemed to have occurred if any party other than GE (and its subsidiaries) becomes the beneficial owner, directly or indirectly, of securities of the Company representing more than 50% of the combined voting power of the Company's then outstanding securities or a sale of substantially all the assets." (Salmon Decl. ¶ 2.) Thus, Salmon contends that the Letter Agreement also excluded GECC's ownership of the Company from constituting a change of control event. Salmon states that Cox only returned to him the first two pages of the signed Letter Agreement, but that he did not realize this oversight until the current litigation. Salmon has no physical evidence that the third page existed. His computer has crashed since the contract was signed, making it impossible to retrieve an electronic copy of the Letter Agreement he sent to Cox.

Cox testified as follows regarding the changes made from the September 19, 2002 draft agreement to the signed Letter Agreement:

> Q. The change in control language in paragraph 12 is slightly different . . . with the change, as I see it, that the change of control language goes from 12 months after change of control to 3 months after a change of control. Do you know how or why it was that that change was made?
>
> A. Jim [Salmon] made that change.
>
> Q. And do you know why?
>
> A. Yes, I believe it was in reference to our conversation . . . relating to my issues

4

and concerns as to whether or not I would get the equity that was being offered under my employment agreement.

Q. Was there any discussion about draft [sic] or about deleting the definition of change in control that you had drafted on Thursday evening?

A. No, there wasn't discussion about it.

Q. Did you ever have any discussion with Jim about deleting the definitional section of change in control from your first proposal?

A. We had discussion relating to the lack of the formality of the plans and the concerns as to whether or not I would get the equity, and the fact that Jim felt much more comfortable with his relationship as future CEO at that point in time, but understanding my concerns as it related to the fact that there was no formal plan, there was–there were no documents that ensured that I would get what was being offered.

(Cox Depo. at 98-100.) Cox argues based on this testimony that the definition section excluding GECC's ownership as a change of control was omitted from the final Letter Agreement because Salmon had not been able to formalize an equity plan for Cox.

After the Letter Agreement was executed, Priority America emerged from bankruptcy on December 11, 2002. All of the existing shares were cancelled and new shares were issued to GECC, who became the controlling shareholder with 75% of the shares as had been specified in the Reorganization Plan dated September 4, 2002.

On January 30, 2003, Cox informed Salmon of his intent to leave employment with Priority America.[1] Jim Salmon sent an e-mail to O'Brien, the executive headhunter, on February 4, 2003 informing him of Cox's intention to leave. He also notified GE that Cox was leaving during that same timeframe. (Salmon Depo. at 134.) Salmon notified other Priority America

---

[1] Cox accepts this fact statement for the purposes of his Motion for Summary Judgment, but he reserves the right to assert at trial that he merely expressed his displeasure with his job situation on January 30, 2002 and that Priority America terminated his employment.

employees that Cox was leaving the company in mid-March 2003. (Id. at 133.) On March 10, 2003, Marilyn Crocket, a secretary in Priority America's accounting department made a notation on her calendar that read "Bill Cox Terminated." Cox worked at the Priority America office through some time in March 2003 and then he worked from home. Cox was paid salary through mid- to late-April 2003. (Salmon Depo. at 139.) Cox's employment ended on April 23, 2003. In his deposition, Salmon gave an explanation of why Cox continued employment with the company after he had given his notice of resignation:

> Q. Why did, if Bill [Cox] came to you on January 30th and told you it wasn't working out and it wasn't, and he needed to move on, why is it that he was still providing services through the middle of April.
>
> A. Bill told me that he wouldn't leave me hanging, as he said, and I'll wrap up everything that I've got going on. I'm not just going to walk out on you, but I'll finish everything that I've started. And like I said, again, we had just exited from bankruptcy, so we had a lot of issues going on. So he said he'd stay around and get those points to a closure.
>
> Q. So by March when you made the announcement to the employees, it was definite that Bill was going to be leaving?
>
> A. It was definite when he told me the first time.

(Id. at 135.)

Cox initiated this lawsuit on October 1, 2003 and filed an Amended Complaint on May 20, 2005. (Docs. 1, 33.) Cox alleged that Priority America failed to pay him the severance benefits to which he was entitled under the Letter Agreement in violation of Ohio common law and the Ohio Revised Code. Cox also alleged that Priority America failed to provide him with notice of his right to continuation of benefit coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), codified in ERISA at 29 U.S.C. § 1161 et seq.

On September 29, 2005 this Court filed an Order granting Defendant's Motion for Partial

Summary Judgment on the federal claims, denying Plaintiff's Motion for Partial Summary Judgment, and dismissing without prejudice Plaintiff's state law claims on jurisdictional grounds. (Doc. 41.) However, on February 15, 2006 the Court reinstated Cox's state law claims and Plaintiff's Motion for Partial Summary Judgment because the Court maintained diversity jurisdiction over the state law claims. (Doc. 44.)

## II.     STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). On a motion for summary judgment, the moving party has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).

The moving party may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. Pro. 56(e). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

Liberty Lobby, 477 U.S. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

**III.     ANALYSIS**

**A.      Breach of Contract**

In order for the Court to grant summary judgment to Cox on his breach of contract claim, he must establish that Priority America breached the Letter Agreement by not paying him his base salary, bonus and benefits for twelve months after the effective date of his termination following a change of control of the company. Cox was entitled to these severance benefits only if (1) Priority America's issuance of controlling shares to GECC upon its emergence from bankruptcy constituted a change of control under the terms of the Letter Agreement and (2) Cox terminated his employment with Priority America within three months of the change of control event. There is no dispute for purposes of resolving the pending motion that the Letter Agreement constituted a contract and that Cox performed his obligations thereunder. See Doner v. Snapp, 98 Ohio App.3d 597, 600, 649 N.E.2d 42, 44 (1994) (listing elements of breach of contract in Ohio as the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff).

Priority America contends summary judgment is inappropriate because material facts are in dispute whether the issuance of controlling shares to GECC was a change of control event under the Letter Agreement. Preliminarily, the parties dispute whether or not the employment contract contained a third page. In his Declaration, Salmon states that the third page of the Letter Agreement contained the definition of what constitutes a change of control. (Salmon Decl. ¶ 2.) According to this definition, a change of control would occur only if GE (or a

8

subsidiary) was no longer a beneficial owner of at least 50% of the company. (Id.) Thus, GECC's ownership of more than 50% of the shares of the company upon Priority America's emergence from bankruptcy would not constitute a change of control. However, Salmon has no physical evidence that the Letter Agreement contained a third page. In his Deposition, Salmon states the following:

> Q. "Where do you think the third page is?"
>
> A. "I don't know where the third page is. I believe I sent it up to Bill [Cox] and when he gave it back to me, did he omit the third page and give it to me and I just didn't look to check? I took him at his word that he was going to agree to what he had talked about. I don't remember searching the document for the three pages, but I do know that was the agreement going in."
>
> Q. "Are you swearing under oath, sir, that on September 23rd, 2002, that you placed two copies or two originals of a three-page letter and sent that to Bill Cox?"
>
> A. "I believe I did, yes, because that was the agreement."

(Salmon Depo. at 117.) Salmon also states, as further proof that a third page existed, that the parties contemplated at length the definition of "change of control" and that Cox himself actually drafted the original definition of "change of control."

In contrast, Cox maintains that the Letter Agreement mailed to him by Salmon on September 23, 2002, was only two pages. In his deposition, Cox stated the following:

> Q. "Did you have any discussion with Jim at any point about deleting or changing the definition of change in control from which you had drafted on Thursday evening?"
>
> A. "Other than what I just stated, no."
>
> Q. "Was the letter in three pages when you received it or was it in two pages?"
>
> A. "It was in two pages."

9

(Cox Depo. at 100.) Cox then cites an Ohio case for the proposition that "a court cannot make contracts for others, read into them terms or language not there, nor change the conditions of contracts lawfully made." Herder v. Herder, 32 Ohio App.2d 75, 76-77, 288 N.E.2d 213, 215 (1972). The Court finds that this general principle from Herder is not applicable on this point. The immediate issue here is not whether a missing term should be read into a fully integrated contract; rather, the immediate issue is whether the physical written contract entered into by Cox and Priority America contained three pages.

Whether the Letter Agreement contains third page with a change of control definition provision is in direct dispute. One party says the contract contained two pages; the other party says that it contained three pages. The existence of the third page is an issue of material fact that must be determined by the jury. If a jury ultimately finds, as Priority America asserts, that the Letter Agreement contained a third page excluding GECC's ownership of the company upon its emergence from bankruptcy as a change of control event, then Cox cannot establish a breach of contract claim. Accordingly, Cox is not entitled to summary judgment on the breach of contract cause of action.[2]

**B.     Ohio Revised Code § 4113.15**

Ohio Revised Code § 4113.15 provides for an award for liquidated damages in specified circumstances when an employer fails to pay wages owed an employee. The Court assumes for purposes of this Order only that severance pay owed to a former employee qualifies as wages

---

[2] The Court need not, and does not herein, seek to resolve any of the parties' remaining factual or legal disputes, including but not limited to, (1) whether the issuance of shares to GECC upon Priority America's emergence from bankruptcy was "change of control" in the absence of a contractual definition of "change of control" and (2) the date of Cox's termination as that term is used in the Letter Agreement.

owed by an employer under the statute. However, for the reasons explained above, material facts are in dispute whether or not Priority America owed Cox severance pay. Accordingly, Cox is not entitled to summary judgment on the statutory cause of action.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiff William P. Cox's Motion for Partial Summary Judgment (doc. 28) is hereby **DENIED**.

IT IS SO ORDERED.


       ___s/Susan J. Dlott_____
       Susan J. Dlott
       United States District Judge